## HICKOK OIL CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8587.

Circuit Court of Appeals, Sixth Circuit.

June 5, 1941.

Charles J. Cole and Walter G. Kirkbride, both of Toledo, Ohio, for petitioner.

Carlton Fox, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Carlton Fox, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

The issue raised by the appeal is whether a basis fixed by the Board of Tax Appeals for determining depreciation of a ten-year contract for supplying gasoline and oil to the petitioner is supported by substantial evidence. The review involves deficiencies in income taxes for the fiscal years ending June 30, 1930, and June 30, 1931, respectively. The deductions claimed in each of the taxable years for exhaustion of the contract were disallowed by the respondent and led to his assertion of the deficiencies.

There is no controversy with respect to the evidentiary facts. As found by the Board, they are based upon a stipulation and exhibits. The dispute relates to the conclusions drawn therefrom which, it is contended by the petitioner, present questions of law or mixed questions of law and fact upon which it urges we may express our independent judgment.

The petitioner was organized on May 15, 1928, to take over the business of the Hickok Producing Company then engaged in marketing gasoline, lubricating oil, and other products in Ohio and Michigan through subsidiaries. Its organization was in pur-

suance of a plan of the president of the Producing Company to expand its business by acquiring controlling interests in other distributing companies and obtaining a dependable source of gas and oil supply that would permit it to make long-term contracts with customers. It negotiated for increased outlets conditioned upon its entering into a contract with the Pure Oil Company for its supply of gasoline. A preliminary contract with the Pure Oil Company was concluded on April 30, 1928, which called for the organization of the taxpayer with a capital stock of 450,000 shares divided as follows:

- 200,000 shares Class A common, par value $10 per share.
- 200,000 shares Class B common, without par value, and
- 50,000 shares 7% cumulative preferred, par value $100 per share.

The taxpayer's articles of incorporation provided that the Class A and Class B stock should be on a parity only when, after the payment of all charges for depreciation, depletion and expenses, including dividends on preferred stock, the corporation should have earned and have available for payment of cash dividends upon Class A stock $3,500,000, and should have paid cash dividends upon that stock amounting to $1,750,000; that holders of Class A stock should receive 60%, and holders of Class B stock 40% of all the cash dividends paid on the common stock until dividends received by holders of Class A stock exceeded $3,000,000, after which the directorate should consist of an even number, one-half to be elected by the holders of each class of common stock.

On May 31, the taxpayer acquired the assets and business of the Hickok Producing Company and entered into a final supply contract with Pure Oil. Therein it was provided that the 200,000 shares of Class B stock were to be placed in escrow for future delivery to Pure Oil but subject to certain payments to be made to and for the account of the taxpayer by the Pure Oil Company which, as thereafter made, aggregated $188,000, and subject also to the delivery to the taxpayer by the Pure Oil Company for a period of ten years and until the taxpayer should have earned and made available for cash dividends the sum of $3,-500,000, and should have paid dividends in the aggregate sum of $1,750,000 upon its Class A stock, all gasoline which the taxpayer required for sale at 5¢ per gallon less

than the delivered tank-wagon price (later changed to filling-station prices), and also other products. The agreement also provided that the Class B stock should not be delivered by the escrow agent to the Pure Oil Company, nor be transferable or assignable until the Class A and B stocks should have reached parity in voting power under the articles of incorporation.

The taxpayer, in accordance with a previous resolution of its board of directors, debited $200,000 on its books on account of the contract, and credited a like amount on account of the Class B common stock, and set up a reserve for amortization of $19,999.92 for the year ending June 29, 1929, and $20,000 for each year thereafter to June 30, 1935, when the contract was extended to August 1, 1945. The value placed upon the contract and the stock was not changed until upon a reorganization in March, 1937, through which the Pure Oil Company received 500,000 shares of common stock at a par value of $1 per share in exchange for the 200,000 shares of Class B stock, when it was increased to $500,000.

By § 23(k) of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, page 358, a reasonable allowance for exhaustion of property used in a trade or business is permitted, and by § 113(a) and § 114(a), 26 U.S.C.A. Int.Rev.Acts, pages 380, 383, the basis for exhaustion and obsolescence is the cost of the property, which, by Treasury Regulation 74, promulgated under the Revenue Act of 1928, is treated as a capital sum to be recovered by the taxpayer through a charge-off over the useful life of the property either in equal annual installments or in accordance with some other recognized trade practice.

The question before the Board of Tax Appeals was the value of the Pure Oil contract as of its date based upon its cost to the taxpayer. Since the consideration for the contract was the 200,000 shares of Class B stock, less the payments to be made by Pure Oil, the problem was to determine the value of that stock. At the time the contract was entered into the stock had no market value, was not transferable or assignable, and was subject to the terms of the escrow agreement already recited. Since the contract became the property of the taxpayer its value to it became important in determining the total value of its net assets and the respective values of the Class A and Class B stocks. The taxpayer contended before the Board that the supply

contract should be valued by itself as an asset for the purpose of determining the basis for exhaustion, and that so valued, by its experts, it was worth not less than $7,500,000. In the alternative it contended that the contract, as an underlying asset of its stock including the B stock, required the valuation of the B stock to be determined at not less than $2,750,000. It conceded that the $188,000 paid by Pure Oil must be deducted from either valuation, in determining the basis for computing exhaustion.

The petitioner introduced as witnesses its president, and three experts who testified as to the value of the gasoline supply part of the contract as of its date. The president valued it at between four and four and one-half million dollars, basing his judgment upon the fact that he considered the petitioner's total worth to be about 8 or 10 million dollars, and that therefore the value of its 200,000 shares of Class B stock which it paid for the contract, was one-half of that worth. The Board rejected this valuation on the ground that it did not take into account the outstanding preferred stock and the 200,000 shares of Class A stock which, not being subject to the restrictions imposed upon the B stock, obviously represented much more than half of the taxpayer's worth. We are unable to say that the Board's conclusion in this respect was unsound.

The expert witnesses testified to a value ranging from $7,500,000 to $13,500,000, based upon a profit of 2¢ a gallon on prospective sales over the ten-year period of the contract, the 2¢ profit being the differential between the tank-wagon prices and the retail filling-station prices. The Board concluded, however, that this evidence was based upon the subsequent history of the petitioner and the large increase in its sales in the years following the acquisition of the contract, and that such sales and profits were not proper factors in arriving at its valuation since they could not then reasonably have been expected, and could only rest upon speculation. Other considerations also led to this conclusion. The contract was not unusual in the margin of profit it allowed purchasers of like products from Pure Oil Company, and it seemed unreasonable to infer that either party felt that the petitioner was paying millions of dollars for a contract to supply it with gasoline and petroleum products in addition to the prices to be paid for them. The Board gave a practical construction to the intention of the parties in assuming that the contract was induced on the part of the Pure Oil Company by the latter's desire to secure an outlet for its surplus gasoline production, and that the petitioner's inducement was a long-term supply contract at a fixed differential. The greatly increased sales of the petitioner in subsequent years were due to many factors in addition to the contract, such as management, purchase of products from other sources, its business policy, good will and financial position, its contracts with controlled distributing companies, and its marketing facilities. In this situation the Board concluded that the value of the contract to the petitioner in later years was not determinative of its cost in 1928, and that in consideration of all factors it was justified in accepting the book value of the stock and the contract placed upon them by the petitioner itself. It thereupon determined as the base for computing exhaustion the $200,000 valuation assigned to the stock by the petitioner upon its books, and deducted therefrom the $188,000 received from the Pure Oil Company. This left a resultant of $12,000 as the cost of the contract to the petitioner, and in the absence of other trade practices an allowable deduction under the formula of Treasury Regulation 74 for each of the taxable years of $1,200 for exhaustion of the supply contract.

In reviewing the Board's determination of value as of the date the contract was entered into in 1928, we are confronted with the question whether subsequent history is a factor in determining the value of an executory contract. The respondent contends and the Board in effect found that the value of such contract, prospectively viewed, involved so many unknown and unpredictable elements that a forecast of what might be achieved therefrom was too speculative to permit of its precise evaluation. It is true that in Nachod & United States Signal Co. v. Helvering, 6 Cir., 74 F.2d 164, in reliance upon what we assumed to be the rationale of Sinclair Refining Co. v. Jenkins Petroleum Process, 289 U.S. 689, 53 S.Ct. 736, 739, 77 L.Ed. 1449, 88 A.L.R. 496, we held that in valuing rights under a patent as of the time of acquisition, the Board could not close its eyes to the history of its successful exploitation available at the time of decision. But we were there considering a patent which the Supreme Court, in the Jenkins case, said was "a thing unique" since there can be no contemporaneous sales to express the market value of an invention that derives from its novelty, its patentable quality. To later correct uncertain prophe-

cies is not to determine elements of value non-existent at the time, but "to bring out and expose to light the elements of value that were there from the beginning." But a patent assures monopoly and the exclusion of competitors from the field. This cannot be said of a supply contract in a highly competitive industry such as the marketing of gas and oil. Our conclusion in the Nachod case has been thought unsound in the Second Circuit, Guggenheim v. Helvering, 117 F.2d 469, and the Supreme Court, in Dayton Power & Light Co. v. Public Utilities Commission of Ohio, 292 U.S. 290, 54 S.Ct. 647, 653, 78 L.Ed. 1267, said of a similar forecast of value retrospectively made by experts, "Granting even that the testimony had an evidential value, it had that and nothing more. It had no such commanding quality as to apply coercion to the judgment of the appointed triers of the facts, and exclude every choice but one." It must be noted that this was said by Mr. Justice Cardozo, who, in the Jenkins case, when referring to a patent valued years after its purchase, said, "experience is then available to correct uncertain prophecy."

We are not, however, called upon to determine whether, in the light of these cases, our reasoning in the Nachod case led us to an unsound conclusion. We are not, as already suggested, here dealing with a patent, assured of monopoly. Nor do we meet the question whether the Board is in error in rejecting unchallenged opinion evidence upon the question of value. We have here a conflict of testimony upon that issue, and it is for the Board and not for the court, to resolve it. Two of the officers of the Pure Oil Company gave evidence bearing upon the value of the contract. One deposed that the valuing of it would be purely a guess, and the other expressed the opinion that the Pure Oil Company had received nothing for the contract. It is futile to urge upon us that each of these witnesses was interested and biased. The credibility of the witnesses was for the judgment of the Board, and not for our judgment. Equally futile is it to urge that Harvey's testimony was merely a conclusion. He was an official of Pure Oil, knew the circumstances of the transaction, and was competent to express an informed business judgment as to whether Pure Oil had entered into a contract, worth many millions to the petitioner, without an adequate quid pro quo. We do not understand that the Board of Tax Appeals, on questions of value in which it is itself expert, is circum-

scribed by technical rules of evidence. Likewise is it futile to contend that there is no substantial evidence to sustain a finding that the Class B shares had a value of $200,000. If inexactness in determination is due to the nature of the transaction or the taxpayer's inability to introduce certainty, the taxpayer may not complain if the Board assigns some value to the contract when the evidence fails, with any degree of precision, to establish any. At least this much supports the finding of the Board: the taxpayer itself placed a value of $200,000 upon the stock and retained that valuation for years upon its books. In the absence of any more certain basis for its appraisal we cannot say that the Board was in error in accepting book value, inconclusive as that otherwise might be, in the face of more definite evidence.

The decision of the Board of Tax Appeals is affirmed.