J. R. Simplot Company v. Commissioner.
J. R. Simplot Co. v. Commissioner
Docket No. 5603-64.
United States Tax Court
T.C. Memo 1967-104; 1967 Tax Ct. Memo LEXIS 157; 26 T.C.M. (CCH) 488; T.C.M. (RIA) 67104; May 10, 1967
L. E. Haight, J. R. Simplot Co., Boise, Idaho, for the petitioner. John C. Picco, for the respondent. FAY
Memorandum Opinion FAY, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the fiscal years ending on February 28, 1958 and 1959, and February 29, 1960, in the amounts of $27,725.94, *159 $4,294.14, and $5,460.00, respectively. Petitioner has not raised an objection to respondent's determinations for the fiscal years ended February 28, 1959, and February 29, 1960, and has conceded part of the deficiency determined for the fiscal year ended February 28, 1958. The sole issue remaining for determination is whether the loss sustained in the fiscal year ended February 28, 1958, by petitioner in the amount of $19,841.61 from the disposition of certain timber-cutting contracts is properly a capital loss as determined by respondent or an ordinary loss as claimed by petitioner. All of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner, J. R. Simplot Company, an accrual basis taxpayer, is a Nevada corporation having a place of business at 200 Simplot Building, Boise, Idaho, and is qualified to conduct business in the State of Idaho. It filed a timely Federal income tax return for the fiscal year ended February 28, 1958, with the district director of internal revenue for the district of Idaho. Among other things, petitioner is engaged in the sawmill business in *160 Idaho and California, manufacturing lumber. It operates a sawmill located near Horseshoe Bend, Idaho. On October 3, 1955, petitioner, doing business as the Caldwell Lumber Company, entered into a timber-cutting contract with the United States Forest Service (hereinafter referred to as the Clear Creek contract). Two additional contracts were entered into with the Bureau of Land Management and the United States Forest Service on April 16, 1956, and November 26, 1956 (hereinafter referred to as the Cascade Public Domain and the Smith Creek contracts, respectively). The three timbercutting contracts, entered into in the normal course of petitioner's lumber manufacturing business, provided for the cutting and purchase of a certain quantity of timber prior to a certain date set forth therein and at specified stumpage rates. [1]
The Clear Creek contract provided in pertinent part as follows: General Terms
*161 1. For and in consideration of the promises and agreements hereinafter contained, the Forest Service agrees to permit the purchaser to cut and the purchaser agrees to cut the timber included in this contract, and the Forest Service agrees to sell and the purchaser agrees to purchase and remove such cut timber, subject to the provisions hereof. 2. It is hereby understood and agreed that, except as otherwise provided herein: a. All right, title, and interest in or to any timber included in this contract shall remain in the United States until it has been paid for, cut and scaled; and all right, title and interest in or to any timber which has been paid for, cut and scaled but not removed from the sale area by the purchaser within the period of this contract or any extension thereof shall revest in the United States. b. In the event any timber included in this contract is destroyed or damaged to the extent it is unmerchantable by fire, wind, flood, insects, disease, or similar cause the party holding title to the destroyed or damaged timber shall bear the loss in stumpage and required deposits resulting from such destruction or damage, and there shall be no obligation on the part *162 of the Forest Service to supply, or on the part of the purchaser to accept and pay for, other timber in lieu of that destroyed or damaged; Provided, that damage to or loss of timber removed from the sale area before scaling shall be borne by the purchaser, and: Provided further, that this paragraph shall not be construed to relieve either party of liability for negligence. * * *
Section 5a. Period of Contract. 1. The purchaser agrees to cut and remove from the sale area all timber included in this contract prior to 12/31/57 unless the termination date is adjusted pursuant to Section 5a-2, or the contract period is extended by the Forest Service. All other obligations of the purchaser likewise shall be discharged prior to the above date, or any adjustment or extension thereof: * * *
Section 12g. Performance by Other than Purchaser. 1. The acquisition or assumption by another party under an agreement with the purchaser of any right or obligation of the purchaser under this contract shall be ineffective as to the Forest Service unless and until the Forest Service shall have been notified of such agreement and shall have recognized and approved it in writing signed by *163 the forest officer who approved this contract or by his successor, or superior officer; and in no case shall such recognition or approval: a. Operate to relieve the purchaser of the responsibilities or liabilities he has assumed hereunder; or b. Be given unless such other party (1) Is acceptable to the Forest Service as a purchaser of timber, and assumes in writing all of the obligations to the Forest Service under the terms of this contract as to the incompleted portion thereof, or (2) Acquires the rights in trust as security and subject to such conditions as may be necessary for the protection of the public interests. * * *
Section 13b. Settlement. 1. The purchaser agrees that any money advanced or deposited under this contract may, upon failure on his part to fulfill all and singular the requirements set forth in this contract or made a part hereof, be retained by the Forest Service to be applied toward the satisfaction of his obligations assumed under this contract without prejudice to any other rights and remedies of the Forest Service. The termination dates of all three contracts were duly extended, by the respective Federal agencies involved, for cutting in *164 1957 and subsequent years. Petitioner began cutting operations pursuant to the contracts, but in 1957, due to a lack of timber in the vicinity of the Horseshoe Bend sawmill and because of the adverse conditions of the lumber market, it commenced the liquidation of its logging equipment and cut down its production at the sawmill. In the fiscal year ended February 28, 1958, petitioner's Horseshoe Bend sawmill was sold and no further lumber manufacturing was done by petitioner in Idaho. Since timber remained to be cut pursuant to the three contracts, petitioner sought to negotiate a cancellation of the contracts with the United States Forest Service and the Bureau of Land Management. The Federal agencies involved would not consider a cancellation of the contracts nor would they consider an "across the board" transfer of the contracts to a third party, stating that section 12g of the contracts prevented the petitioner from relieving itself of its responsibilities or liabilities by a sale or transfer of the contracts. Upon the failure of these negotiations petitioner decided to find a responsible person who would assume the uncompleted contracts. On April 13, 1958, petitioner entered *165 into an agreement with one Lawrence Hettinger, doing business as Producers Lumber Company, of Boise. The agreement was in the form of a letter dated April 3, 1958, written by petitioner and later agreed to and signed by Hettinger (d/b/a Producers Lumber Company). The agreement provided that: We have agreed to assign these contracts to you, and you are accepting the assignments in accordance with the following terms and conditions: (a) You will accept the assignment of each of the timber sale contracts, exactly as the sale now stands. Any deposits which this company has made under these contracts will be retained by the government agency involved, and you will not be required to make any reimbursement therefor to us. However, you will hereafter be responsible for full performance under the terms and conditions of each of the contracts, including compliance with all state and federal regulations, and you agree to save this company harmless from any liability which might be incurred by reason of these contracts. (b) At the time the assignments are made you will procure a bond for each of the contracts, in accordance with the requirements thereof. At the same time we will cancel *166 the current bonds which name this company as principal. * * *
(d) In consideration for your assuming our liability under the contracts, we will pay you the total sum of $7,000.00 * * *. We will have the right, through our authorized agent or agents, at all times to inspect the road work and the rate of completion. All work must, of course, be done in accordance with the specifications contained in the contract and be approved by the Forest Service, and we have the right to designate the Forest Service Ranger in the area as our agent for the purpose of inspection and approval prior to the making of any payment. * * *
Pursuant to this last quoted provision, petitioner did in fact conduct regular inspections of the work to assure itself that the basic contracts were being performed. On April 9, 1958, an "Application for Recognition and Approval of Third Party Agreement" was made to the Federal agencies. Proper approval of the application was given upon the condition that said approval would not operate to release petitioner from any of its obligations under the timber-cutting contracts. On its Federal income tax return for the fiscal year ended February 28, 1958, petitioner *167 claimed as an ordinary business deduction the sum of $19,841.61, described therein as losses from "Other abandonments." [2]
*168 Respondent in his statutory notice of deficiency determined that the losses described as "Other abandonments" were sustained in the fiscal year ended February 28, 1958, as a result of the sale or exchange of the timber-cutting contracts and that they were, therefore, deductible only as a capital loss. The sole issue for determination is whether the loss sustained by petitioner in the amount of $19,841.61 is properly deductible as an ordinary or capital loss. Petitioner argues that the timber-cutting contracts involved herein are noncapital or ordinary assets or, in the alternative, that the transfer of the contracts by petitioner to Hettinger (d/b/a Producers Lumber Company) did not constitute a sale or exchange. Petitioner concludes, therefore, that under either alternative the loss is properly characterized as ordinary. Respondent, on the other hand, contends that the contracts were either capital assets as defined in section 1221[3] or assets used in a trade or business as defined in section 1231(b)[4] and that their transfer constituted a sale or exchange resulting in a capital loss to petitioner. [5]
*169 We agree with petitioner that the timbercutting contracts before us are noncapital or ordinary assets in its hands and therefore find that the loss sustained on their transfer is properly characterized as an ordinary loss. The Supreme Court has stated that an asset, though not literally within the exceptions of section 1221 may nevertheless give rise to noncapital or ordinary income or loss when it is an integral part of the taxpayer's business. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52 (1955). They noted that Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. We are of the opinion that the case at bar is within the rule set forth in the Corn Products decision. Another precedent squarely in point is this Court's decision in Mansfield Journal Co., 31 T.C. 902 (1959), affd. 274 F. 2d 284 (C.A. 6, 1960). In that case we held that where a newspaper obtained and held a long-term contract for the purchase of newsprint, *170 which had been entered into for the purpose of assuring it of a constant supply of a raw material essential to its publishing business, it did so in the course of, and as an integral part of, its business. We therefore concluded, under the doctrine of the Corn Products decision, that the gain realized by the newspaper on the sale of these contracts was ordinary income. See also Booth Newspapers, Inc. v. United States, 303 F. 2d 916 (Ct. Cls. 1962). On the facts before us we can see no material distinction between this case and that of Mansfield Journal Co., supra.We have found that the contracts in question were essential to and an integral part of petitioner's lumber business. They were entered into to assure petitioner of a supply of raw material for its lumber manufacturing business. They were not in any way entered into by reason of an "investment" motive nor could they reasonably be considered as having been held by petitioner as an investment at the time of sale. [6] In reference to this latter point, the mere fact that petitioner herein was liquidating its lumber operation in Idaho does not per se result in a characterization of the transaction *171 as productive of capital gain or loss. Cf. Estate of Jacques Ferber, 22 T.C. 261, 263 (1954); Williams v. McGowan, 152 F. 2d 570 (C.A. 2, 1945).
For the first time, on brief, respondent has argued that the contracts, rather than being capital assets under section 1221, are more properly characterized as assets used in a trade or business as defined in section 1231. We find that this contention lacks merit. First, respondent has conceded that the contracts are not "timber" with respect to which section 631 applies as defined in section 1231(b)(2). Under section 1231(b)(1) respondent contends, in the alternative, that the property is realty used in petitioner's trade or business or that it is property used in petitioner's trade or business which is of a character which was subject *172 to the allowance for depreciation provided in section 167. To constitute realty petitioner must have acquired a present interest in the standing timber on the execution of the contract. The effect of the contract in turn depends upon the intent of the parties. On the facts before us we are convinced that the parties did not intend to transfer a present interest in the standing timber. The contract specifically provides that no interest would pass to petitioner until the trees were cut, scaled, and paid for. The rights and duties of the parties are stated, in part, as follows: the Forest Service agrees to permit the purchaser to cut and the purchaser agrees to cut the timber included in this contract, and the Forest Service agrees to sell and the purchaser agrees to purchase and remove such cut timber * * * [Emphasis supplied.] In addition, the contract provides that all risk of loss, except for petitioner's negligence, shall be borne by the seller. We hold that the foregoing indicates an intent that no present interest in the timber pass to petitioner. We do not consider such cases as Barclay v. United States, 333 F.2d 847 (Ct. Cls. 1964); and United States v. Giustina, 313 F. 2d 710 *173 (C.A. 9, 1962), interpreting the word "owner" for the purposes of section 117(k)(2) of the 1939 Code (now section 631(b) of the 1954 Code), to be controlling with reference to the issue before us. Such cases merely interpreted the word "owner" for the purpose of permitting the taxpayer to avail himself of the benefit of section 117(k). We also note that our decision is compatible with the Idaho Supreme Court's decision in Winton Lumber Co. v. Shoshone County, 50 Idaho 130, 294 P. 529 (1930), which held that a similar contract was insufficient to transfer a present interest in the standing timber. Respondent contends, in the alternative, that we should view the contract as property used in petitioner's trade or business of a character which is subject to the allowance for depreciation. We cannot agree. The contract is merely a sales contract obligating petitioner to purchase a specific amount of cut timber within a period of approximately two years. It is not the type of supply contracts dealt with in Marc D. Leh, 27 T.C. 892 (1957), affd. 260 F. 2d 489 (C.A. 9, 1958), and in Hickok Oil Corporation v. Commissioner, 120 F. 2d 133 *174 (C.A. 6, 1941), affirming a Memorandum Opinion of the Board of Tax Appeals, in which the taxpayers therein had a right as against the sellers to purchase from them an unspecified amount of gasoline. Neither of these contracts obligated the taxpayer to purchase any gasoline. We are of the opinion that these contracts are distinguishable from the contract before us. We hold that the contract before us has neither a basis nor a useful life so as to be of a character subject to the allowance for depreciation. Nor can it be said that this contract is of a type that has a value which will diminish with use or the passage of time. Having held that the loss sustained by petitioner was an ordinary loss within the rationale of the Corn Products case, we need not consider petitioner's alternative argument, namely, that the transfer of these contracts did not constitute a sale or exchange. Decision will be entered under Rule 50. Footnotes
1. The parties have stipulated that the terms and conditions of the Cascade Public Domain and the Smith Creek contracts are similar to those of the Clear Creek contract. The quoted provisions of the latter, therefore, will be deemed to be representative of all three contracts.↩
2. Although the formal documents relating to the transfer of the contracts were executed in April of 1958, it is understood that they incorporated informal agreements made in the last days of the fiscal year ended February 28, 1958, and the other meaningful events relating to this issue also arose in that fiscal year. Under the circumstances, petitioner, an accrual basis taxpayer, accrued the resulting loss in the fiscal year ended February 28, 1958. The year of loss has not been questioned by respondent. The losses were computed as follows: ↩
Deposit on Clear Creek sale
$ 5,000.00
Cascade Public Domain - balance of deposit, March 1, 1957
$12,636.96
July 31, 1957, timber cut
6,382.49
6,254.47
Smith Creek deposit, 3/1/57
$ 3,000.00
Additional deposit, 6/30/57
4,000.00
$ 7,000.00
June stumpage cut costs
6,172.00
$ 828.00
Adjustment on June stumpage, per Forest Service
420.00
$ 1,248.00
To correct stumpage deposits by Forest Service audit
339.14
1,587.14
Total loss on timber
$12,841.61
Payment to Producers Lumber Company
7,000.00
Total loss claimed
$19,841.61
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade * * * (2) property, used in his trade or business * * * (3) a copyright, a literary, musical, or artistic composition, or similar property * * * (4) accounts or notes receivable * * * (5) an obligation of the United States * * * ↩
4. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167↩, held for more than 6 months, and real property used in the trade or business, held for more than 6 months * * * 5. If petitioner is correct in its characterization of the contracts as "1231 assets," respondent argues that under sec. 1231(a)↩ the result to petitioner is that the loss is properly characterized as a capital loss.
6. This case is readily distinguishable on its facts from our decision in Missisquoi Corporation, 37 T.C. 791↩ (1962), in which we held that though the petitioner therein acquired certain debentures in order to assure itself of a source of raw materials, that motive had ceased to exist and at the time of sale petitioner held such debentures as an investment.