**Emmett E. NORTON and Frances G. Norton**

v.

**The UNITED STATES.**

No. 31–75.

United States Court of Claims.

March 23, 1977.

Charles P. Duffy, Portland, Or., attorney of record, for plaintiff; Duffy, Stout, Georgeson & Dahl, Portland, Or., of counsel.

C. Patrick Derdenger, Burbank, Cal., with whom was Acting Asst. Atty. Gen. Myron C. Baum, Washington, D.C., for defendant; Theodore D. Peyser, Jr., Washington, D.C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge.

This tax refund action involving the characterization of gain realized by plaintiffs from their sale of a timber cutting contract is before the court on cross motions for summary judgment. The facts essential to the disposition of the case are not in dispute. For the reasons set forth below, we agree with the defendant that the gain realized by the plaintiffs does not qualify as gain from the sale of a capital asset. We, therefore, allow defendant's cross motion for summary judgment.

Plaintiff,[1] Emmett E. Norton, an individual doing business as the Norton Logging Company, on January 30, 1968, entered into a timber cutting contract[2] with the United States Forest Service (hereinafter referred to as the Turn Point contract). The Turn Point contract specified:

> In consideration of the premises and the promises hereinafter contained, Forest Service agrees to sell and permit Purchaser to cut and Purchaser agrees to purchase and cut included Timber.

All right, title and interest in and to any included timber in the Turn Point contract remained in the Forest Service until it had been cut, scaled and paid for; at that time, title vested in the plaintiff who then had to remove the processed timber from the contract sales area within the period of the contract. All losses, except for negligence, were to be borne by the party holding title.

Throughout the remainder of 1968 and until March 19, 1969, plaintiff was engaged in the logging business. This entailed both the cutting of the standing timber located in the South Tongass National Forest subject to the Turn Point contract and the selling of the logs to Ketchikan Pulp Company (hereinafter referred to as Ketchikan), an unrelated Washington corporation. The plaintiff did not operate a sawmill nor was he engaged in manufacturing lumber, veneer or other wood products. His sole activity was the cutting of the standing timber and its sale to Ketchikan.

As the standing timber was cut and scaled, the plaintiff was required to pay the Forest Service under the terms of the contract $9.05 per thousand board feet for Sitka Spruce and $2.32 per thousand board feet for Western Hemlock and other species. To insure the performance of his obligation under the Turn Point contract, the plaintiff executed a performance bond in the amount of $5,000. During the period January 30, 1968, through March 19, 1969, the plaintiff logged 9,919,040 board feet of the estimated 30,000,000 board feet of timber subject to the contract.

On March 19, 1969, 13½ months after the plaintiff entered into the Turn Point contract, he sold all of the timber cutting rights under the contract to Ketchikan for the sum of $127,500,[3] with no interest thereon, payable at the rate of $8.50 per thousand board feet of logs produced. In connection with the transaction, Ketchikan executed a promissory note which recites that Ketchikan will pay the plaintiff the $127,500, regardless of an over-run or under-run of the volume of timber under the Turn Point contract.[4]

---

1. Frances G. Norton is a party to this action only because she filed joint returns with her husband, Emmett E. Norton, for the years in question. Where reference is made to Mr. Norton acting individually, he will be referred to as the "plaintiff"; where reference is made to both Mr. and Mrs. Norton, they will be referred to as the "plaintiffs."

2. United States Department of Agriculture Forest Service Timber Sale Contract No. 05–92. The contract relates to certain designated timber in the South Tongass National Forest, State of Alaska.

3. Even though the bill of sale specified that both the Turn Point contract and various pieces of logging equipment were sold for $127,500, the Norton affidavit makes it clear that the $127,500 was the purchase price of the timber cutting rights alone.

4. Since the total purchase price was not dependent upon the amount of timber cut, plaintiff concedes that he did not retain an economic interest in the timber transferred to Ketchikan within the meaning of I.R.C. § 631(b). Therefore, I.R.C. § 1231(b)(2) is not applicable to the instant case.

Prior to the March 19, 1969, sale to Ketchikan, the plaintiff had neither sold nor held for sale a Government timber contract. After that sale, the plaintiff ceased independent logging operations entirely and sold all logging equipment, machinery and supplies to Ketchikan.

In filing their joint federal income tax return for the year 1969, the plaintiffs elected to report the gain realized from the sale of the timber cutting rights to Ketchikan on the installment basis pursuant to § 453.[5] Their tax basis for determining gain or loss was $7,400,[6] with a resulting 94.2 percent of gain. On their income tax returns for the years 1969, 1970 and 1971, the plaintiffs reported 94.2 percent of the amount received from Ketchikan as long-term capital gains.

Upon audit of plaintiffs' tax returns, the Commissioner of the Internal Revenue Service (Commissioner) determined that the gain recognized by plaintiffs in 1969, 1970 and 1971, attributable to the sale of the Turn Point contract to Ketchikan, should have been reported as ordinary income rather than as long-term capital gain. A statutory notice of deficiency for 1969 through 1971 was issued by the Commissioner on March 20, 1973. Thereafter, plaintiffs received billings for the deficiency, which they were unable to pay within 10 days because of lack of funds.

On November 21, 1973, the plaintiffs paid $8,000 to the District Director, Anchorage, Alaska. On January 21, 1974, the Division of Veterans Affairs of the Department of Commerce of the State of Alaska paid, on the plaintiffs' behalf, the remaining sum of $10,999.48 from the proceeds of a loan.[7]

Plaintiffs filed with the Internal Revenue Service (IRS) Center at Ogden, Utah, their timely refund claims for the years 1969 through 1971. The IRS not having acted upon their refund claims for more than 6 months after the date of filing, the plaintiffs filed a petition in this court based upon the same grounds as set forth in the refund claims.

Plaintiffs argue that the timber cutting contract involved herein was a capital asset, or in the alternative, plaintiff's interest in the contract and underlying timber was "real property used in the trade or business" of plaintiff within the meaning of § 1231(b)(1). Under either alternative, plaintiffs contend that the gain realized on the sale of the contract qualifies as long-term capital gain since the contract was held by plaintiff for more than six months. Nevertheless, plaintiffs concede that a portion of the payments received by them on the sale of the Turn Point contract should be imputed interest, taxable as ordinary income.[8] Lastly, plaintiffs seek refund of the additions to the tax, "late-payment penalties," which they argue should not have been exacted from them since their failure to pay the deficiencies within ten days of the date of the first notice and demand therefor was due to reasonable cause—inability to pay or undue hardship—and not due to willful neglect within the purview of § 6651(a)(3).

On the other hand, defendant contends that the gain realized by plaintiffs from the sale of the Turn Point contract does not qualify for capital gain treatment. Initially, the defendant submits that plaintiff's interest in the Turn Point contract and the

---

5. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

6. Plaintiffs' tax basis is the sum of a $5,000 cash bond and a $2,400 advance stumpage deposit with the Forest Service.

7. Payments totaling $18,999.48 were received by the Internal Revenue Service; $5,468.81 was allocated to plaintiffs' 1969 tax year; $6,290.58 was allocated to plaintiffs' 1970 tax year; and $7,240.09 was allocated to plaintiffs' 1971 tax year.

8. I.R.C. § 483; Treas.Reg. § 1.483–1(c)(2), T.D. 6873, 1966–1 C.B. 101. In the case of an installment contract which does not contain any provision for interest, the amount of interest to be imputed is computed at the rate of 5 percent per annum compounded semiannually. Although not applicable to the instant case, it should be noted that T.D. 6873 was amended by T.D. 7394, 1976–1 C.B. 135.

underlying timber was real property used in plaintiff's trade or business; it must be treated as a noncapital asset by virtue of § 1221(2), but is precluded from § 1231(a) treatment by the *Corn Products*[9] doctrine since the contract was an integral part of the plaintiff's business. Alternatively, defendant argues that the *Corn Products* doctrine would exclude plaintiff's contract from § 1221. Defendant has failed, however, to address the plaintiffs' last contention that their failure to pay the deficiencies within ten days of the date of the first notice and demand therefor was due to reasonable cause.

We are faced with the preliminary issue of whether plaintiff's interest in the Turn Point contract would qualify either as a § 1221 asset or as a § 1231(b)(1) asset, but for the *Corn Products* doctrine. Of necessity, we then must examine the *Corn Products* doctrine to determine its applicability to the instant case.

■ Defendant contends and the plaintiffs submit as an alternative argument that plaintiff's interest in the Turn Point contract and underlying timber was real property used in the plaintiff's trade or business. We find these contentions lack merit. To constitute realty plaintiff must have acquired a present interest in the standing timber on the execution of the contract. The facts before us do not demonstrate that the parties to the contract intended to transfer a present interest in the standing timber. As we earlier recapitulated, the contract gave plaintiff the right to purchase and cut timber; however, until cut and paid for, the title to that timber remained in the seller. This indicates an intent that no present interest in real property, the standing timber, passed to the plaintiff. We have considered our decision in *Barclay v. United States*,[10] in addition to

*United States v. Giustina*,[11] which decisions, while interpreting similar timber cutting sales contracts with relation to the word "owner" in § 117(k)(2) of the 1939 Code [now § 631(b) of the 1954 Code], held that such contracts gave the holder beneficial ownership of all the timber on the tract.[12] To the defendant, the fact that plaintiff had beneficial ownership in the timber is sufficient to make the timber cutting contract real property. Defendant reasons that standing timber is real property; therefore, a timber cutting contract which gives beneficial ownership in standing timber is real property. With this reasoning we cannot agree. The above cases define owner status for § 117(k)(2) of the 1939 Code purposes; they do not determine that the timber contract there in issue is real property. In fact, this court in *Barclay*[13] refused to consider whether the timber contract there in issue qualified for § 117(a) of the 1939 Code [now §§ 1221 and 1222 of the 1954 Code] which thereby obviated the need to determine whether the contract was real property used in the taxpayer's trade or business. Since we are convinced that on the facts before us the parties did not intend to transfer a present interest in the standing timber, we hold that plaintiff's interest in the Turn Point contract was not real property used in his trade or business. It should be noted that our decision is compatible with the Tax Court's decision in *J. R. Simplot Co. v. Commissioner*,[14] which held that a similar contract was insufficient to transfer a present interest in the standing timber.

■ To disqualify the Turn Point contract from § 1231(b)(1), we must also determine that it was not "property used in the trade or business of a character which is subject to the allowance for depreciation provided in section 167." Given the nature of the contract, this task is not difficult.

9. *Corn Products Refining Co. v. Comm'r*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

10. 333 F.2d 847, 166 Ct.Cl. 421 (1964). *See also Union Bag-Camp Paper Corp.*, 325 F.2d 730, 163 Ct.Cl. 525 (1963).

11. 313 F.2d 710 (9th Cir. 1962).

12. *See also* Treas.Reg. § 1.631–2(e)(2) (1960) and Rev.Rul. 58–295, 1958–1 C.B. 249.

13. 333 F.2d at 851, 166 Ct.Cl. at 427.

14. 26 T.C.M. (CCH) 488 (1967).

The Turn Point contract was merely a sales contract obligating the plaintiff to purchase a specific amount of timber—whether cut or not—within a period of approximately three years.[15] Nonetheless, the contract was not the type asset which diminished in value with use or passage of time and it had neither a basis nor a useful life; consequently, it was not of a character subject to the allowance for depreciation. We, therefore, hold that the Turn Point contract was not property used in the plaintiff's trade or business within the definition of § 1231(b)(1). However, we do not agree with the plaintiffs who submit that the contract is a § 1221 asset.

▮ Plaintiffs argue that they sold the Turn Point contract, itself, rather than the timber which was the subject of that contract. They assert that the contract was "property" which did not fall into any of the specified exclusions of § 1221 and, therefore, the contract is a capital asset, the sale of which gave rise to capital gain. The plaintiffs also rely upon Commissioner v. Ferrer,[16] for the proposition that a contract is a capital asset if the contract rights created an equitable interest in specific property which was itself a capital asset. By arguing that the contract gave plaintiff an equitable interest in the timber subject to the contract, citing Barclay v. United States, supra, the plaintiffs reason that they sold a capital asset. We disagree.

With respect to the treatment of amounts received on the sale of contract rights, courts have approached in numerous ways the question of whether the property disposed of was the type of property that Congress intended to classify as a capital asset.[17] Plaintiffs point to the approach utilized in Ferrer to support their argument. In Ferrer, Judge Friendly summarized the immense body of decisional law in the assignment of income area and wrestled with the various complex issues that can arise from the basic question of whether a taxpayer has transferred a "property" right or an "income" right. Rather than utilize this approach, we feel that the instant case can be decided under the Corn Products doctrine exception to the statutory syllogism that all property is a capital asset unless specifically excluded by the exceptions in § 1221.

The Supreme Court has stated that the sale of property, though not literally within the exceptions of § 1221, may nevertheless give rise to ordinary income or loss when the asset is an integral part of the taxpayer's business. Corn Products Refining Co. v. Commissioner, supra note 9. The application of the Corn Products doctrine to the instant case seems clear to us. The plaintiff was engaged in the logging business: cutting standing timber and selling the cut timber to Ketchikan. The Turn Point contract gave the plaintiff the right to cut timber; it insured the plaintiff a ready source of supply of the logging business raw material, timber. The contract, therefore, was essential to and an integral part of plaintiff's logging business. The contract gave plaintiff rights in the timber which were so integrally related to his ordinary business objectives of logging the timber that a "business use" intention rather

15. The contract was awarded on January 30, 1968, and was to terminate on December 31, 1970.

16. 304 F.2d 125 (2d Cir. 1962).

17. Eustice, *Contract Rights, Capital Gain, and Assignment of Income—the Ferrer Case,* 20 Tax L.Rev. 1 (1964). The approaches may be grouped into certain broad categories: (1) Is the asset "property" which is a "capital asset" under § 1221? *See Comm'r v. Gillette Motor Transport Co.,* 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); *Comm'r v. Ferrer, supra* note 16. (2) Do the amounts received by the taxpayer upon the sale of the contract rights represent a substitute for future ordinary income that would otherwise have been received by the taxpayer? *See Comm'r v. P. G. Lake Inc.,* 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *Comm'r v. Ferrer, supra.* (3) Does the transaction constitute a "sale or exchange"? *See Fairbanks v. United States,* 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed.2d 855 (1939). (4) Was the property acquired with an intention that it would serve an integral function in the taxpayer's regular business activities? *See Corn Products Refining Co. v. Comm'r, supra* note 9.

than an "investment" intent prevailed.[18] In other words, the contract was acquired by plaintiff with an intention that it would serve an integral function in his regular business activities and that motive had not changed at the time of sale. Under the *Corn Products* doctrine, gain on the sale of that contract is, therefore, part of plaintiff's ordinary business income. We are not persuaded otherwise by plaintiffs' argument that since the sale of the Turn Point contract represents the concluding phase of liquidating the logging business, the *Corn Products* doctrine should not be applied.[19]

Since we hold that the gain realized by the plaintiffs from the sale of the Turn Point contract was ordinary income within the rationale of the *Corn Products* doctrine, we need not consider the applicability of § 483 to the instant case.[20] However, we must address plaintiffs' argument that the additions to the tax, as provided under § 6651(a)(3), should not have been exacted from them. Plaintiffs argue that their failure to pay the deficiencies within ten days of the date of the first notice and demand therefor was due to their inability to pay which to them was reasonable cause, not willful neglect.

■ Reasonable cause for failure to pay tax exists to the extent the taxpayer can satisfactorily show that he exercised ordinary business care and prudence in providing for the payment of his liability, but was, nevertheless, either unable to pay the tax or would have suffered "undue hardship" [21] if he paid on the due date.[22] The burden of proving that the failure to pay was due to reasonable cause and not to willful neglect

is on the taxpayer. If the taxpayer offers no excuse, the penalty will be sustained by the court.[23]

■ In the instant case, plaintiffs have failed to introduce any evidence to show that their failure to pay the tax was due to reasonable cause. We must, therefore, sustain the § 6651(a)(3) addition to the tax.

CONCLUSION

For the reasons hereinbefore stated, plaintiffs' motion for summary judgment is denied, defendant's cross motion for summary judgment is granted and plaintiffs' petition is dismissed.

18. However, it should be noted that our approach here does not serve to read out of the statute the obvious and important class of "business connected" assets covered by § 1231.

19. *See J. R. Simplot Co. v. Comm'r*, 26 T.C.M. (CCH) at 492. *Cf. Hollywood Baseball Ass'n v. Comm'r*, 423 F.2d 494, 499–500 (9th Cir.), *cert. denied*, 400 U.S. 848, 91 S.Ct. 35, 27 L.Ed.2d 85 (1970) (*Corn Products* doctrine applied to § 337).

20. I.R.C. § 483(f)(3).

21. Undue hardship has the same meaning for § 6651(a)(3) purposes as it does under § 6161,

extensions of time to pay tax, Treas.Reg. § 1.6161–1(b) (1960).

22. Treas.Reg. § 301.6651–1(c)(1), T.D. 7133, 1971–2 C.B. 415.

23. *Deffendall v. United States*, 386 F.Supp. 509, 512 (D.Or.1974); *Fischer v. Comm'r*, 50 T.C. 164, 177 (1968). *Cf. Olshausen v. Comm'r*, 273 F.2d 23 (9th Cir. 1959), *cert. denied*, 363 U.S. 820, 80 S.Ct. 1256, 4 L.Ed.2d 1517 (1960) (I.R.C. § 294 of the 1939 Code, burden to prove reasonable cause on the taxpayer).