INDIAN CREEK LUMBER COMPANY AND CONSOLIDATED SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Indian Creek Lumber Co. v. Commissioner
Docket No. 9341-77.
United States Tax Court
T.C. Memo 1982-146; 1982 Tax Ct. Memo LEXIS 603; 43 T.C.M. (CCH) 841; T.C.M. (RIA) 82146; March 23, 1982. *603 During the years in issue, an Indian Creek Lumber Company subsidiary, X, purchased four helicopters. Prior to X's purchase, the manufacturer of the helicopters had engaged in an extensive program to test the commercial applications of this type of helicopter. The manufacturer had previously marketed a similar type of helicopter for military use. Pursuant to the commercial testing program, the helicopters purchased by X had been part of a fleet of helicopters that the manufacturer had leased to various parties for use on commercial projects. While two of the helicopters purchased by X had never been sold before, the other two had previously been sold to and used by the German government for military purposes. When the manufacturer reacquired these two helicopters from the German government, it modified them for commercial use. Held, X was not the original user of the four helicopters within the meaning of secs. 48(b) and 167(c), I.R.C. 1954, and therefore, X was not entitled to treat the helicopters as "new section 38 property" or claim depreciation deductions therefor under the double declining balance method of depreciation. During the year ended May 31, 1974, another Indian *604 Creek Lumber Company subsidiary, Y, sold certain contract rights to timber and received full payment of the purchase price therefor. The purchase price payable for the contracts was subject to subsequent adjustment upon an exact determination of the actual volume of timber subject to the contracts. Held, the payment received by Y for the contracts was includable in income in the taxable year of receipt. Held further, the income from the sale of the contracts was taxable as ordinary income. Charles P. Duffy and Philip N. Jones, for the petitioners. Gary R. DeFrang, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year Ended
Deficiency
May 31, 1972
$ 136,539
May 31, 1973
380,618
May 31, 1974
186,130
May 31, 1975
133,781 By amended answer, respondent determined an additional deficiency of $ 262,572 for the taxable year ended May 31, 1974. After concessions, the issues for decision are: [1] *605 1. Whether the original use of certain property commenced with a member of the Indian Creek Lumber Company group of consolidated subsidiaries for purposes of determining the amount of the investment credit and the method of depreciation allowable for such property. 2. Whether the payment received by a member of the Indian Creek Lumber Company group of consolidated subsidiaries upon the sale of its interest in certain timber contracts must be included in income in the taxable year of receipt, and if so, whether such income is taxable as capital gain or ordinary income. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Indian Creek Lumber Company (hereinafter IC) is a California corporation with its principal office in Central Point, Oregon. For the taxable year ended May 31, 1972, IC filed a consolidated income tax return with its subsidiaries, Plumas Lumber Company (hereinafter Plumas) and Erickson *606 Air-Crane Co. (hereinafter Air-Crane). For the taxable years ended May 31, 1973, 1974, and 1975, IC filed consolidated income tax returns with its subsidiaries, Plumas, Air-Crane, and Erickson Air-Crane Co. of Washington, Inc. [2] IC and its subsidiaries (hereinafter petitioners) maintain their books on the basis of a fiscal year ending May 31 and compute their income under the accrual method of accounting. Issue 1: Investment Credit and Depreciation: Original Use
The Sikorsky Aircraft Division (hereinafter Sikorsky) of United Technologies Corporation (formerly United Aircraft Corporation) manufactures helicopters. In the late 1950's, Sikorsky built a prototype "heavy-lift" helicopter which was capable of lifting three tons. In the early 1960's, the prototype was redesigned using a jet turbine engine which enabled it to lift as much as 10 tons. Subsequently, the redesigned helicopter was assigned model number S-64A. The first three S-64A helicopters [3] built were sold to the German government. Thereafter, the United States Army ordered six S-64A helicopters for use in *607 Vietnam. The United States Army's successful use of these helicopters in Vietnam led to the manufacture and sale of approximately 90 additional S-64A helicopters. Sometime in 1967 or 1968, Sikorsky realized that the Vietnam conflict was winding down. In order to offset the anticipated loss of military business, Sikorsky decided to attempt to introduce its heavy-lift helicopter onto the commercial market. At the time that Sikorsky decided to enter the commercial market, it imagined that there might be a need for its heavy-lift helicopter in the following commercial activities: (1) logging timber; (2) the construction of electrical transmission lines; (3) unloading cargo vessels, including unloading without the use of a port, pier, or terminal; (4) the installation of air conditioners on highrise buildings; (5) moving oil drilling rigs to remote areas; and (6) general construction in remote areas. Sikorsky did not know whether the use of its helicopter in any of these activities was feasible. At or about the same time that Sikorsky decided to market its heavy-lift helicopter for commercial use, it reacquired *608 the three S-64A helicopters that had previously been sold to the German government (hereinafter referred to as "the used S-64A helicopters"). These helicopters had been used by the German government for at least three years. Since Sikorsky was not certain that a commercial market for its heavy-lift helicopter existed, it decided to make these helicopters part of a fleet of helicopters which would be used to determine whether the contemplated commercial applications were operationally and economically feasible. Eventually, seven helicopters were used in this fleet, two of which were destroyed in crashes. In the first commercial application of its heavy-lift helicopter, Sikorsky used one of the used S-64A helicopters to move an oil drilling rig in South America. This experimental use of the helicopter proved successful. Consequently, Sikorsky concluded that there must be a commercial market for its heavy-lift helicopter and decided to obtain Federal Aviation Administration (hereinafter FAA) certification of the helicopter. To obtain FAA certification, Sikorsky was compelled to make some modifications to the design of the existing model S-64A helicopter, which in turn required Sikorsky *609 to rebuild the used S-64A helicopters. When Sikorsky was assured of FAA certification of the commercial version of its heavy-lift helicopter, it built four additional helicopters. These helicopters also became part of the fleet that Sikorsky used to test the commercial applications of its heavy-lift helicopter. After receiving FAA certification, Sikorsky assigned the commercial version of its helicopter model number S-64E and proceeded with its program of testing. The S-64E helicopter was tested on a variety of projects, including the following: (1) the construction of a ski lodge; (2) the movement of oil drilling rigs in Alaska; (3) unloading cargo vessels; (4) the construction of electrical transmission lines; (5) the construction of a dike; (6) the installation of air conditioning units on highrise buildings; and (7) logging timber. In most of the projects on which the S-64E helicopter was used, Sikorsky attempted to recover its operating costs by entering into a "wet lease" with the party performing the project [4] whereby Sikorsky provided both the helicopter and crew. In one case, however, Sikorsky leased two S-64E helicopters to the Rowan Drilling Company, Inc. (hereinafter Rowan *610 Drilling), under a "dry lease," pursuant to which Sikorsky only leased the helicopters while Rowan Drilling provided its own crew which Sikorsky trained. One of the helicopters leased to Rowan Drilling had serial number 64060. The lease for that helicopter was executed on April 7, 1969, and terminated on April 15, 1970. Although the program of testing the S-64E helicopter was undertaken in part to demonstrate the capabilities of the helicopter to potential customers, this program was primarily needed to determine and refine the commercial uses of the helicopter in order to locate and develop the most promising markets therefor. After each project was completed, Sikorsky personnel evaluated the performance of the helicopter to determine what could be done to improve its operation. While the testing did not result in any total failures, some of the initial trial uses of the helicopter were not successful. Nevertheless, through perseverance and design changes to the cargo-handling equipment and the materials which were being moved, all of the projects were successfully completed. *611 In its search for a suitable market, Sikorsky was looking for an industry which could use the S-64E helicopter on a daily basis so as to justify a substantial investment therein. Following the successful use of the helicopter in a timber harvesting project in which Sikorsky, Air-Crane, and the United States Forest Service participated, Sikorsky concluded that only the logging industry offered such potential. Prior to this project, Sikorsky had not known whether the helicopter could be used to harvest timber. After the timber harvesting project and approximately three years of commercial testing, United Aircraft Corporation made its first sale of Sikorsky's S-64E helicopter to Air-Crane. During its taxable years ended May 31, 1972, 1973, and 1974, Air-Crane purchased from United Aircraft Corporation and placed into service in its logging business four S-64E helicopters and related components and accessories. The helicopters and related equipment constituted depreciable tangible personal property. The taxable year of acquisition, the purchase price, the qualified investment (if treated as "new section 38 property"), [5] and the useful life of each helicopter and the related equipment *612 are as follows: Acquired Taxable
Purchase
Qualified
Useful
Item
Year Ended
Price
Investment
Life
Helicopter-Serial
No. 64060
May 31, 1972
$ 1,258,271
$ 1,258,271
7 years
Helicopter-Serial
No. 64002
May 31, 1973
1,350,000
900,000
5 years
Helicopter-Serial
No. 64003
May 31, 1973
1,400,000
933,000
5 years
Intermediate
Gearbox [6]
May 31, 1973
100,000
66,667
5 years
Intermediate
Gearbox [6]
May 31, 1973
100,000
66,667
5 years
Gear Boxes
and Roter Heads [6]
May 31, 1973
100,000
66,667
5 years
Helicopeter-Serial
No. 64058
May 31, 1974
1,550,000
1,033,333
5 years
Air-Crane purchased the helicopters and related equipment pursuant to three separate agreements (hereinafter "purchase agreements").The purchase agreements described each helicopter as "used" and provided that the helicopters were to be believered on an "'as is, where is' basis." Except for those items designated as "new," the related equipment purchased by Air-Crane was also sold *613 on an "'as is, where is' basis." Furthermore, the purchase agreements warranted that the seller would convey good title to all of the goods sold thereunder, but expressly disclaimed the implied warranty of merchantability. With respect to those items of related equipment which were designated as "new," however, the following additional warranty was provided: Seller warrants to Buyer that at the time of delivery the goods sold under this paragraph will be free from defects in material and manufacture and will conform substantially to Seller's applicable specifications as stipulated in this Agreement. Seller's liability and Buyer's remedy under this warranty are limited to the repair or replacement, at Seller's election, of goods or parts thereof returned to Seller which are shown to Seller's reasonable satisfaction to have been defective * * * The year manufactured and the approximate age when acquired of the four helicopters purchased by Air-Crane are set forth below: Helicopter
Year
Age
Serial No. 64002
1962
10
Serial No. 64003
1962
10
Serial No. 64058
1968
4
Serial No. 64060
1968
3
All of these helicopters had been part of the fleet which Sikorsky had used to test the commercial applications *614 of the S-64E helicopter. The helicopters bearing serial numbers 64002 and 64003 were two of the used S-64A helicopters that Skorsky had reacquired from the German government and rebuilt. The helicopter bearing serial number 64060 was one of the helicopters that Sikorsky had leased to Rowan Drilling. At the time Air-Crane purchased its helicopters, Sikorsky had set a sales price of $ 2,100,000 for a "new" S-64E helicopter. On the consolidated income tax returns filed by petitioners for the years in issue, Air-Crane claimed investment credits for the helicopters as if such property constituted "new section 38 property." In addition, Air-Crane claimed depreciation deductions for the helicopters using the 200 percent declining balance method of depreciation.In the notice of deficiency, respondent determined that Air-Crane was not entitled to the claimed investment credits and depreciation deductions because the "original "use of the helicopters had not commenced with Air-Crane. Respondent determined the allowable investment credits for the helicopters treating them as "used section 38 property" and computed depreciation deductions therefor using the 150 percent declining balance method *615 of depreciation. Issue 2: Income from Sale of Timber Contracts
Plumas was formed in June 1956. From that time until June 1973, Plumas engaged in the business of operating a lumber sawmill near Crescent Mills, California. The annual capacity of Plumas's sawmill was approximately 30,000,000 board feet of timber. While the principal source of the timber processed by Plumas's sawmill was timber purchased from the United States Forest Service[7] (hereinafter USFS), Plumas also purchased a significant quantity of timber from other parties. Virtually all of the timber processed by the sawmill was acquired from these two sources. Pursuant to separate timber cutting contracts awarded to Plumas by the USFS, it purchased the timber on the following tracts of land for use in its business: Tract
Date of Award
Babcock
February 26, 1973
Cold Stream
March 16, 1970
Lights Creek Skyline
June 2, 1970
Nye Creek
December 28, 1970
Flournoy
November 30, 1970
Bagley
June 17, 1968
Bogard
November 8, 1972
Moonlight
June 28, 1972
Fleming
June 28, 1973
Under each timber cutting contract, the USFS agreed *616 to sell and Plumas agreed to purchase, cut, and remove all of the "included timber" [8] within the identified tract. Each contract required Plumas to cut and remove all of the timber designated for cutting by the termination date of the contract. Plumas paid for each specie of timber cut at a specified rate per thousand board feet (Mbf), with some rates subject to adjustment under escalation procedures. The timber cutting contracts required Plumas to pay for any designated timber remaining uncut upon the expiration of the contract. Plumas could only obtain an extension of the contract period under certain enumerated circumstances. All right, title, and interest in and to any included timber remained with the USFS until it had been cut, scaled, removed from the sale area, and paid for; at which time title would vest in Plumas. All losses, other than those due to negligence, attributable to timber damaged or destroyed *617 by causes such as fire or disease were to be borne by the person holding title to such timber, except that Plumas would bear such losses when incurred after the removal of timber from the sale area. With respect to the assignment by Plumas of its rights under the timber cutting contracts, the contract pertaining to the Babcock tract, the provisions of which are representative of the other contracts, provided: B8.4 Performance by Other Than Purchaser. The acquisition or assumption by another party under an agreement with Purchaser of any right or obligation of Purchaser under this contract shall be ineffective as to Forest Service, until Forest Service has been notified of such agreement and has given written approval by the forest officer who approved this contract, his successor or superior officer; and in no case shall such recognition or approval: (a) Operate to relieve Purchaser of the responsibilities or liabilities he has assumed hereunder; or (b) Be given unless such other party: (i) Is acceptable to Forest Service as a purchaser of timber and assumes in writing all of the obligations to Forest Service under the terms of this contract as to the uncompleted portion thereof, *618 or (ii) Acquires the rights in trust as security and subject to such conditions as may be necessary for the protection of the public interests. Pursuant to an agreement dated June 15, 1973 [9] (hereinafter "the sale agreement"), Plumas sold its plant, equipment, the above-mentioned USFS timber cutting contracts, [10] *619 and other real and personal property to Louisiana-Pacific Corporation (hereinafter LP) for $ 3,110,648. In addition, Plumas assigned to LP a contract under which it was entitled to receive the logs removed by Cheney Forest Products Co. (hereinafter Cheney) from a certain USFS timber sale known as "Jenny Springs" (hereinafter referred to as "the Cheney contract"). [11] Plumas did not own the USFS timber cutting contract pertaining to the Jenny Springs sale, but merely had the right to receive the logs removed therefrom by Cheney. During the taxable year ended May 31, 1974, Plumas received full payment of the purchase price set forth in the sale agreement. After the sale, the principal business activity of Plumas was "investments." In pertinent part, the sale agreement provided as follows: 3) The risk of loss as to all items sold hereunder, including any rights under the U.S. Forest Service contracts, shall shift on closing from Seller to Buyer. However, Buyer shall not permit or suffer any breach of any timber sale contract, and will harvest all logs harvestable under the terms of said timber sale contract within the time provided by each contract, or prior to June 15, 1976, whichever shall be the earlier. Buyer shall not apply for reduction in permissible log harvest, or extension of said contracts without the prior written consent of Seller. 4) From an after the date of closing, all logs cut from timber sale contracts shall be branded with a brand different from the brand heretofore used by Seller. Seller warrants to the Buyer that the total net volume of logs receivable, Forest Service Scale Scribner Decimal C, short log, of the within Agreement is 84 million feet. *620 To the extent that Buyer receives less than the aforesaid volume, Buyer will be damaged. On the other hand, to the extent that Buyer receives more than 84 million feet, Buyer will receive an unbargained for benefit. In the event that the total volume received is more than 84 million feet, Buyer will pay a bonus to Seller upon ascertainment of final volume. In the event that the footage is less than 84 million feet, Seller will pay unto Buyer, Buyer's damages. If the parties cannot agree upon the bonus or damages, as the case may be, they agree to arbitrate the same under the rules of the American Arbitration Association. Buyer will provide Seller with scale tickets, and other reasonable documentation, from time to time, so that Seller may be informed as to the volumes that Buyer receives near [sic] the within Agreement. 5) In order to transfer the United States Forest Service contracts above referred to, it will be necessary that the consent of the Forest Service be obtained. Both parties hereto will cooperate in obtaining such consent, and will execute all documents as may be reasonably required in furtherance thereto. In the interim, and pending transfer, following the date *621 of closing, it will be necessary that Buyer continue to operate on such sales in the name of Seller, and Seller consents thereof. By an ancillary agreement dated November 7, 1973, Plumas and LP agreed as follows with respect to the bonus or damages payable if LP received more or less than the warranted volume of timber: [12] This will express and confirm the agreement of Louisiana-Pacific Corporation and Plumas Lumber Company, related to their contract dated June 15, 1973, that the bonus/damages for overrun/underrun of the nominal 84,000 Mbf (Scribner's Decimal "C" scale) * * * shall be at the rate of $ 17.52 Mbf (Scribner's Decimal "C" scale). The foregoing adjustment shall be made within 60 days after ascertainment of the overrun/underrun. Although the sale agreement is not clear on this point, the parties intended that the logs received under the Cheney contract would be taken into account together with the timber cut by LP under the nine USFS *622 timber cutting contracts in computing whether LP had received the warranted volume of timber and any overrun or underrun with respect thereto. [13]
Pursuant to a document entitled "Third Party Agreement," the USFS approved the transfer from Plumas to LP of all of the timber cutting contracts, except those pertaining to the Board and Fleming tracts. Under the third party agreement, LP assumed all of Plumas's obligations under the timber cutting contracts, agreement to perform those contracts in accordance with the terms thereof. Due to their failure to obtain USFS approval of the transfer of the timber cutting contracts pertaining to the Board and Fleming tracts, Plumas and LP entered into a supplemental agreement dated May 18, 1974. This agreement provided, in part, as follows: It is agreed: 1. Plumas will exclude the Bogard and Fleming sales from the group of sales submitted to the Forest Service for its acceptance of the transfers contemplated by the contract of 15 June 1973. It is understood that the Forest Service will *623 confirm and approve such transfers if the Bogard and Fleming sales are so excluded. 2. In so excluding the Bogard and Fleming sales from the group submitted to the Forest Service, Plumas will not be deemed to have rescinded the sale of these two contracts (Bogard and Fleming) to L-P, but will instead be regarded, and conduct itself, as holding said Bogard and Fleming sales contracts as the property of L-P (as between these parties); and Plumas will promptly comply with L-P's written instructions to transfer the Bogard and Fleming contracts to any person, firm or corporation in a lawful manner, or to dispose of the same in any lawful manner directed by L-P. 3. The parties hereto agree that the stumpage on the Bogard and Fleming sales shall be established forthwith by appropriate means (cruise or agreement between parties). If the parties are unable to agree upon the amount of the stumpage, then L-P shall have a cruise made by a cruiser acceptable to Plumas, at L-P's expense, to determine the stumpage. As used herein, "stumpage" means the volume of timber that a qualified owner of the sales could legally remove therefrom; and it shall also include the scaled amount of timber already *624 cut by L-P on either or both of said sales to the extent that credit therefor has not already been applied to the 84,000 Mbf quarantee. In the event that L-P fails to harvest the timber on the Bogard and Fleming sales, then the volume established under the terms of this paragraph shall be credited toward the 84,000 Mbf guaranteed minimum cut mentioned in the contract of June 15, 1973 and the ancillary agreement of November 7, 1973. 5. L-P shall wholly defend and indemnify Plumas against any liability incurred by Plumas in performing this agreement, and in holding or transferring said sales contracts pursuant hereto; exclusive of liabilities caused by Plumas' breach of this agreement. 6. The risk of loss, legal or material, of any property or value related to the Bogard and Fleming sales shall be assumed by L-P. This includes the risk of fire or other natural occurence, and the risk of termination or other action by government that may wholly or partially affect the value of said sales. On the date of the sale to LP, Plumas assigned $ 1,471,680 of the purchase price to the timber contracts it had sold to LP. This allocation was computed on the basis of a sale of 84,000,000 board *625 feet of timber at a price of $ 17.52 per thousand board feet. Although subsequent adjustments to certain accounts caused Plumas to allocate only $ 1,458,735 of the purchase price to the timber contracts for tax and financial reporting purposes, Plumas and LP had contemplated a sale of the timber contracts in exchange for a purchase price of $ 17.52 per thousand board feet of timber subject to those contracts. On the consolidated return filed by petitioner for the year ended May 31, 1974, Plumas reported long-term capital gain of $ 1,458,735, under section 1231 from the sale of the timber contracts. [14] By amended answer, respondent alleged that the $ 1,458,735 gain reported on petitioners' consolidated return constituted ordinary income, and accordingly, asserted an additional deficiency of $ 262,572 for the taxable year ended May 31, 1974. OPINION Issue 1: Investment Credit and Depreciation: Original Use
Section 38 allows a taxpayer to claim a credit for investments in certain qualifying property. The amount of the investment credit can vary depending upon whether the property is considered "new" or "used" section 38 property. Secs. 48(b) *626 and (c). Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business or held for the production of income. While section 167(b) authorizes the use of certain accelerated methods of depreciation, including the 200 percent declining balance method, section 167(c) limits the application of these methods of depreciation to property meeting the requirements set forth therein. In defining the term "new section 38 property" and limiting the applicability of certain authorized methods of depreciation, sections 48(b) and 167(c) use similar language. Namely, these sections provide, to the extent relevant to the instant case, that a taxpayer may treat property as new section 38 property and claim depreciation deductions for such property using the 200 percent declining balance method "if the original use of such property commences with the taxpayer." [15] *627 With respect to the term "original use," section 1.48-2(b)(7), Income Tax Regs., states: The term "original use" means the first use to which the property is *628 put, whether or not such use corresponds to the use of such property by the taxpayer. For example, as reconditioned or rebuilt machine acquired by the taxpayer will not be treated as being put to original use by the taxpayer. The question of whether property is reconditioned or rebuilt property is a question of fact. Property will not be treated as reconditioned or rebuilt merely because it contains some used parts. See also sec. 1.167(c)-1(a)(2), Income Tax Regs. Congress intended sections 48(b) and 167(c) to be applied in a consistent manner in determing whether the original use of property commences with the taxpayer. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 519; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 862; cf., Kansas City Southern Railway v. Commissioner,76 T.C. 1067, 1120 (1981). Petitioners maintain that the original use of the four helicopters that Air-Crane purchased from Sikorsky commenced with Air-Crane. First, petitioners assert that the helicopters bearing serial numbers 64002 and 64003, which had been used by the German government, were so extensively modified upon reacquisition that the prior use of such helicopters *629 should be disregarded. Second, they argue that Sikorsky merely used the four helicopters as demonstrators which it held primarily for sale to customers in the ordinary course of its business and that such a use of the helicopters did not constitute a "use" for purposes of sections 48(b) and 167(c). Consequently, petitioners conclude that the original use of all four helicopters commenced with Air-Crane. Respondent, on the other hand, insists that the original use of the helicopters bearing serial numbers 64002 and 64003 commenced with the German government. Furthermore, even if the German government's use of those two helicopters is disregarded, respondent maintains that for purposes of sections 48(b) and 167(c) Sikorsky had used all four helicopters prior to their sale to Air-Crane. Although respondent has conceded that the temporary use of the helicopters as demonstrators by Sikorsky would not preclude a finding that their original use commenced with Air-Crane, he has refused to concede that Sikorsky merely used the helicopters as demonstrators. It is respondent's position that Sikorsky's use of the four helicopters as part of the fleet it operated to test the commercial applications *630 of the S-64E helicopter constituted a commitment of such helicopters to use in its business. We hold for respondent. First, the record indicates that original use of the helicopters bearing serial numbers 64002 and 64003 commenced with the German government, and petitioners have failed to prove otherwise. Second, irrespective of the German government's use of those two helicopters, Sikorsky's use of all four helicopters in its program of testing and market development represented a commitment of such helicopters to use in its business so as to preclude Air-Carne from treating them as "original use" property for purposes of sections 48(b) and 167(c). Although petitioners contend that the used S-64A helicopters were so extensively modified upon reacquisition that they should be considered brand new and the prior use by the Germans disregarded, they did not even establish the extent of the modifications made upon these helicopters. While petitioners attempted to analogize the instant case to the situation where new property is simply constructed with some used parts, [16] they failed to meet their burden of proof. See Rule 142(a), Tax Court Rules of Practice and procedure. On the *631 basis of the record herein, we cannot find that the modifications that Sikorsky made to the used S-64A helicopters constituted the construction of new helicopters, but rather can only conclude that Sikorsky merely rebuilt and/or reconditioned these aircraft. Therefore, we must hold that the original use of the helicopters bearing serial numbers 64002 and 64003 did not commence with Air-Crane as they were "rebuilt" or "reconditioned" as those terms are used in sections 1.48-2(b)(7) and 1.167(c)-1(a)(2), Income Tax Regs., and thus cannot be treated as being put to original use by Air-Crane. Cf., Kansas City Southern Railway v. Commissioner,supra at 1121-1122. Moreover, even if we could disregard the German government's use of those two helicopters, we cannot ignore Sikorsky's use of all four helicopters in the program it conducted to test the commercial applications of the S-64E helicopter. In arguing that Silorsky's use of the helicopters did not constitute a "use" within the meaning of sections 48(b) and 167(c), petitioners have relied upon a line of authority that *632 developed in response to efforts by dealers in property, such as automobiles, to treat what would normally be considered stock in trade as depreciable property. In addressing the question of whether such property is depreciable, this Court has held that the crucial consideration is not the nature of the property but rather the purpose for which it is held, thereby requiring a determination of whether the property is held for use in the taxpayer's trade or business or primarily for sale to customers in the ordinary course of his trade or business. Luhring Motor Company v. Commissioner,42 T.C. 732 (1964); Latimer-Looney Chevrolet, Inc. v. Commissioner,19 T.C. 120 (1952). More recently, applying the above line of authority in the present context, the Internal Revenue Service determined that an airplane dealer's use of some of his stock in trade as demonstrators did not preclude a subsequent purchaser of such an airplane from treating it as new property for depreciation and investment credit purposes. Rev. Rul. 69-272, 1969-1 C.B. 23. Although the airplanes were used as demonstrators, such use was found not to constitute a "use" for depreciation and investment credit purposes because *633 the demonstrators were stock in trade held primarily for sale to customers in the ordinary course of business. Essentially, petitioners contend that the fleet of helicopters which Sikorsky used to test the commercial applications of the S-64E helicopter were merely demonstrators held primarily for sale to customers in the ordinary course of business. Although we believe, as does respondent, that the above discussed line of authority is relevant to the instant case, we cannot agree with the conclusion petitioners have reached on the facts herein. Whether property is held for use in a taxpayer's trade or business or primarily for sale to customers in the ordinary course of business is a question of fact. Luhring Motor v. Commissioner,supra at 751; Duval Motor Co. v. Commissioner,28 T.C. 42, 51 (1957), affd. 264 F. 2d 548 (5th Cir. 1959). A temporary use in the taxpayer's business of property that is normally held by the taxpayer as stock in trade will not cause such property to be classified as property used in the trade or business. Luhring Motor Company v. Commissioner,supra at 753; Duval Motor Co. v. Commissioner,supra at 51. Rather, there must be an unqualified or indefinite *634 commitment of such property to use in the taxpayer's business. Luhring Motor Company v. Commissioner,supra at 753; Duval Motor Co. v. Commissioner,supra at 51. It is not required, however, that the taxpayer make a permanent commitment of such property to use in his business. Luhring Motor Company v. Commissioner,supra at 754. On the basis of the record herein, we must find that the four helicopters purchased by Air-Crane had been held by Sikorsky for use in its trade or business. When Sikorsky decided to market its heavy-lift helicopter for commercial use, it contemplated a need for its helicopter in certain commercial activities. Since Sikorsky was unsure of whether the use of its helicopter in any of these activities was feasible, it created a fleet of S-64E helicopters to test the contemplated commercial applications of its heavy-lift helicopter. The four helicopters purchased by Air-Crane were a part of this fleet. Through the fleet of S-64E helicopters, Sikorsky hoped to establish the commercial feasibility of its heavy-lift helicopter and to develop the most promising markets therefor. While Sikorsky eventually wanted to sell the S-64E helicopters it used in its fleet *635 and more, it clearly believed that its program of testing and market development was a necessary prerequisite to the sale of any such helicopters. In fact, prior to such program there was no commercial market for Sikorsky's heavy-lift helicopter. In addition, the program was needed to perfect the use of the helicopter in the various commercial endeavors to which it would be applied. Thus, it is inapt to assert that Sikorsky simply used its fleet of helicopters as demonstrators. Indeed, these facts indicate that Sikorsky built the fleet of S-64E helicopters to serve as something more than stock in trade. Moreover, we are convinced that Sikorsky made an unqualified and indefinite commitment of its fleet of S-64E helicopters to use in its business. Pursuant to Sikorsky's developmental program, the S-64E helicopter was used on a variety of commercial projects. In engaging in these projects, Sikorsky attempted to recover its operating costs by leasing helicopters from its fleet to the party performing the project. Generally, Sikorsky leased both helicopter and crew, except in one instance where it leased two helicopters [17] and trained a crew provided by the lessee, Rowan Drilling. *636 Significantly, this developmental program was in operation for approximately three years before the first helicopter was sold to Air-Crane. Furthermore, two of the seven helicopters which Sikorsky used in its fleet of S-64E helicopters were destroyed in crashes. All of this demonstrates that Sikorsky made an unqualified commitment of the fleet of helicopters to use in its business. Consequently, we believe that for depreciation and investment credit purposes Sikorsky must be deemed to have used the four S-64E helicopters purchased by Air-Crane.When Air-Crane acquired its four helicopters, they were from three to ten years old. The purchase agreements described the helicopters as "used" and stated that they were to be delivered on an "'as is, where is' basis." While the purchase agreements disclaimed the implied warranty of merchantability with respect to all of the goods sold thereunder, an additional warranty was provided with respect to the quality of those items of related equipment *637 described as "new" by the agreements. In addition, the record shows that the purchase price which Air-Crane paid for each of the helicopters was substantially below that which Sikorsky would charge for a new S-64E helicopter. Thus, the purchase agreements reflect the fact that the helicopters sold thereunder had undergone significant depreciation, and indeed, the record indicates that United Aircraft Corporation claimed depreciation deductions for the fleet of S-64E helicopters used in Sikorsky's development program. In order for the "original use" of property to commence with the taxpayer, when acquired "such property must be new in use, that is never before having been subject to depreciation whether or not depreciation deductions relating to such property were allowable. " H. Rept. No. 1337, 83d Cong., 2d Sess. A49 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess 203 (1954). Clearly, the facts and circumstances herein establish something quite to the contrary with respect to the four helicopters purchased by Air-Crane. Accordingly, we hold that Air-Crane was not the original user of the helicopters and, therefore, was not entitled to treat the helicopters as "new *638 section 38 property" or to depreciate them using the 200 percent declining balance method of depreciation. [18]
Issue 2: Income from Sale of Timber Contracts
By way of amended answer, respondent alleges that the income reported by Plumas from the sale of the timber contracts constitutes ordinary income rather than long-term capital gain. Petitioners, on the other hand, maintain that Plumas erred in reporting any income from the sale of the timber contracts on the return filed for the year ended May 31, 1974, because the income from such sale was not ascertainable during that year. While petitioners bear the burden of proving that Plumas did not realize any taxable income from the sale of the timber contracts during the year ended May 31, 1974, the additional deficiency attributable to the issue raised by respondent's amended answer requires him to carry the burden of proof with respect thereto. Rule 142(a), Tax Court Rules of Practice and Procedure. *639 Initially, we must reject the contention that Plumas did not receive any taxable income from the sale of the timber contracts during the year ended May 31, 1974. Petitioners insist that under the accrual method of accounting Plumas did not realize any taxable income from the sale during that year because the price payable for timber contracts was subject to adjustment upon the subsequent determination of the volume of timber actually received by LP. It is well settled, however, that under the accrual method of accounting payments received without restriction as to disposition are generally includable in income in the year of receipt. Schlude v. Commissioner,372 U.S. 128 (1963); American Automobile Association v. United States,367 U.S. 687 (1961); Farrara v. Commissioner,44 T.C. 189 (1965). The fact that the taxpayer is subject to a contingentliability to refund a portion of the payment does not require a different conclusion. Brown v. Helvering,291 U.S. 193 (1934); North American Oil Consolidated v. Burnet,286 U.S. 417 (1932); S. Garber, Inc. v. Commissioner,51 T.C. 733 (1969). In the instant case, the record clearly shows that Plumas received full payment of the purchase *640 price set forth in the sale agreement during the year ended May 31, 1974, and allocated $ 1,458,735 thereof to the sale of the timber contracts -- an allocation which respondent has not challenged. No evidence has been introduced which even suggests that any restrictions were placed upon Plumas's use or disposition of the funds it received from LP. Pursuant to the sale agreement, Plumas sold the timber contracts in exchange for a payment based upon an estimate of the volume of timber subject to those contracts. The record does not show that this estimate was unreasonable, and Plumas's obligation to refund a portion of the payment if the actual volume of timber fell short of this estimate was a mere contingent liability. Accordingly, we hold that the amount of the purchase price allocated to the timber contracts was includable in income in the year of receipt. We now consider whether the income from the sale of the timber contracts constitutes ordinary income or long-term capital gain. Petitioners contend that the sale of the timber contracts is within the terms of section 631(b), thereby entitling Plumas to the claimed long-term capital gain treatment under section 1231. Respondent, *641 on the other hand, argues that section 631(b) is inapplicable to the sale of the timber contracts because Plumas did not retain an economic interest in the timber disposed of pursuant thereto and, therefore, the income from such sale cannot qualify for capital gain treatment under section 1231. Furthermore, respondent maintains that the timber contracts are not capital assets because they fall within the exception to section 1221 carved out by the Supreme Court in Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). Consequently, respondent insists that the income from the sale constitutes ordinary income. For the reasons set forth below, we agree with and hold for respondent. Section 631(b) provided as follows: (b) Disposal of Timber With a Retained Economic Interest.-- In the case of the disposal of timber helf for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case *642 may be, on the sale of such timber. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. The date of disposal of such timber shall be deemed to be the date such timber is cut, but if payment is made to the owner under the contract before such timber is cut the owner may elect to treat the date of such payment as the date of disposal of such timber. For purposes of this subsection, the term "owner" means any person who owns an interest in such timber, including a sublessor and a holder of a contract to cut timber. [Emphasis added.] Thus, section 631(b) permits an owner of timber to treat any gain or loss realized upon the disposal of such timber subject to a retained economic interest as gain or loss realized upon the sale thereof. Such gain or loss is considered gain or loss from the sale of "property used in the trade or business" for purposes of section 1231. Sec. 1231(b)(2). Prior to the enactment of the predecessor of section 631(b), [19] receipts from a disposal of standing timber subject to a retained *643 economic interest were taxable as ordinary income, the transaction being considered a lease of property. [20] See S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 973, 993. Section 631(b) overrides this result with respect to disposals that meet the requirements set forth thereunder. For purposes of section 631(b), an "owner" of timber means any person who owns an interest in standing timber, including the owner of a contract to cut timber. To own an interest in timber within the meaning of section 631(b), the taxpayer must have a right to cut timber for sale on his own account or for use in his trade or business. Sec. 1.631-2(e)(2), Income Tax Regs.For *644 purposes of section 631(b), Plumas was the owner of the timber it was entitled to cut under the USFS timber cutting contracts it held, and respondent has so conceded. We have found as a fact, however, that under the Chency contract Plumas only possessed the right to receive logs removed by Chency from the Jenny Springs sale. Since Plumas did not have the right to cut the standing timber subject to the Jenny Springs sale, it was not the "owner" of such timber. Accordingly, section 631(b) is inapplicable to the assignment of the Cheney contract to LP. It is clear that under section 631(b) Plumas was the owner of the timber subject to the USFS timber cutting contracts it held and that it made a disposal of such timber when it sold those contracts to LP. Consequently, the applicability of section 631(b) to this sale depends upon whether Plumas retained an economic interest in the timber. Section 1.611-1(b)(1), Income Tax Regs., provides, in pertinent part: * * * An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction *645 of the mineral or severance of the timber, to which he must look for a return of his capital. * * * A person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. * * * [21]
In disposing of an interest in timber, the taxpayer retains an economic interest in such timber when the consideration to be derived from the transaction is dependent solely upon the severance of the timber. Dyal v. United States,342 F. 2d 248, 252 (5th Cir. 1965); Wilson v. Commissioner,26 T.C. 474, 481 (1956). See also Kirby Petroleum Co. v. Commissioner,326 U.S. 599, 604 (1946). Whether or not the taxpayer has made an *646 absolute sale or has retained an economic interest, turns upon the particular facts and circumstances of each transaction. Kirby Petroleum Co. v. Commissioner,supra at 606. On the basis of the facts and circumstances herein, we are convinced that Plumas made an outright sale of the timber cutting contracts to LP and, therefore, hold that Plumas did not retain an economic interest in the timber subject to those contracts.
Pursuant to the sale agreement, Plumas sold the timber contracts to LP and "warranted" that there was 84,000,000 board feet of timber subject to those contracts. At the time of the sale, LP paid Plumas a purchase price for the timber contracts which had been computed on the basis of a sale of the warranted volume of timber. [22] *647 If LP received more or less than the warranted volume of timber, the agreements between Plumas and LP provided for the payment of a "bonus" or "damages," as the case may be, to reflect the actual volume of timber received by LP. Petitioners maintain that this provision made Plumas's receipt of the purchase price dependent upon the severance of the timber subject to timber cutting contracts. We disagree. We cannot conclude that Plumas was simply seeking to profit from the severance of the timber when it transferred its rights under the timber cutting contracts to LP. Pursuant to this transfer, LP was required to cut all of the harvestable timber subject to the contracts and had to pay for such timber whether or not cut. Under the sale agreement, the risk of loss as to all items sold thereunder, including "any rights" under the USFS timber cutting contracts, shifted to LP on the date of closing, June 15, 1973. In addition, the supplemental agreement pertaining to the Bogard and Fleming timber cutting contracts stated the following with respect to the risk of loss: The risk of loss, legal or material, of any property or value related to the Bogard and Fleming *648 sales shall be assumed by L-P. This includes the risk of fire or other natural occurrence, and the risk of termination or other action by government that may wholly or partially affect the value of said sales. Thus, Plumas and LP agreed to value the rights under the timber cutting contracts on the basis of the volume of harvestable timber subject thereto, and LP assumed the risk of any diminution in the value of those contract rights that might occur after the date of closing, including the risk of loss from the destruction of the timber by fire or other natural causes. [23] *649 Even if all of the timber had been destroyed by fire on the day after closing, Plumas would have been entitled to retain the payment it had received from LP. By shifting all of the risks of production under the timber cutting contracts to LP, Plumas completely divested itself of any economic interest in the timber subject thereto. See O'Connor v. Commissioner, 78 T.C.     (Jan. 4, 1982). In our view, Plumas made an absolute sale of its contractual rights to a fixed volume of timber, retaining no interest therein. See Boeing v. United States,121 Ct. Cl. 9, 27-29, 98 F. Supp. 581, 585 (1951). Although petitioners think that the contractual terms requiring the payment of a bonus or damages in the event that LP received more or less than the warranted volume of timber constitutes the reservation of the requisite economic interest by Plumas, we do not. Plumas did not retain an economic interest in the timber merely because the purchase price was determined pursuant to a formula based upon the volume of timber actually received by LP. In determining the purchase price for the timber contracts, Plumas and LP estimated that there was 84,000,000 board feet of timber subject to those contracts, and LP paid Plumas an amount based upon this estimate. If this estimate proved to be incorrect, the purchase price would be adjusted to reflect the correct volume of timber by the payment of a "bonus" or "damages." Consequently, this feature of their agreement merely represented the means by which the purchase price for the timber contracts could *650 be adjusted upon an exact determination of the volume of timber subject thereto. It was not designed to make the price to be paid to Plumas for the timber cutting contracts dependent upon the severance of the timber. In addition, we believe that it is important to note that any overrun or underrun in the estimated volume of logs receivable under the Cheney contract could offset any error with respect to the estimated volume of timber subject to the timber cutting contracts. Accordingly, there was not an inevitable correlation between the amount of timber LP would harvest under the USFS timber cutting contracts and the total purchase price Plumas would receive for the timber contracts. Notwithstanding the inapplicability of section 631(b), we must now determine whether the timber contracts constituted property used in the trade or business under section 1231 or capital assets as defined under section 1221 so as to qualify the income from the sale thereof for capital gain treatment. Since section 631(b) is inapplicable to the sale, section 1231 will not apply to the gain realized therefrom unless the timber contracts qualify as "property used in the trade or business" under section *651 1231(b)(1). Section 1231(b)(1) defines that term to include both "real property used in the trade or business" and "property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167." We hold that the timber contracts did not constitute either real or depreciable property. See Norton v. United States,213 Ct. Cl. 215, 551 F. 2d 821 (1977). [24] To constitute realty, the timber contracts must have given Plumas an interest in standing timber upon execution of the contracts. Nevertheless, the timber cutting contracts provided that all right, title, and interest in and to the timber subject thereto remained with the USFS until it had been cut, scaled, and removed from the sale area. In addition, the Cheney contract only gave Plumas the right to receive cut logs. Consequently, it is clear that the timber contracts did not pass any present interest in standing timber to Plumas and cannot be regarded as real property used in Plumas's trade or business. [25] See Norton v. United States,supra.It is equally clear that the timber contracts were not property of a character subject to the allowance for depreciation. Pursuant to *652 the timber contracts, Plumas simply agreed to purchase certain specified timber. The timber contracts were merely sales contracts which had neither a basis nor a useful life and whose value did not diminish with use or the passage of time. See Norton v. United States,supra.
Finally, we hold that the timber contracts were not capital assets as defined under section 1221. [26] Although the timber contracts did not fall within any of the specific exceptions to the term "capital asset" set forth in section 1221, we believe that those contracts must be excluded from the definition of a capital asset under the doctrine established by the Supreme Court in Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). In Corn Products, the Supreme Court *653 determined that sales of property which are an integral part of the taxpayer's business may generate ordinary income or losses even though the property is not literally excluded from the definition of a capital asset by section 1221. In the instant case, Plumas acquired virtually all of the timber *654 for the sawmill from either the USFS or other parties, such as Cheney. By means of the timber contracts, Plumas acquired a supply of the raw material that was essential to the everyday operation of its sawmill. Consequently, we are convinced that the timber contracts constituted an integral part of Plumas's business within the meaning of Corn Products.Clearly, the timber contracts were acquired and held by Plumas to serve an integral function in the operation of its sawmill business and not for investment purposes. The mere fact that Plumas decided to liquidate that business cannot change the character of these assets. See Grace Bros., Inc. v. Commissioner,10 T.C. 158, 164 (1948), affd. 173 F. 2d 170 (9th Cir. 1949); Shumaker v. Commissioner,648 F. 2d 1198 (9th Cir. 1981), affg. on this issue T.C. Memo. 1979-71. Under these circumstances, the decision of the Supreme Court in Corn Products requires us to hold that the sale of the timber contracts generated ordinary income. See Norton v. United States,supra;Mansfield Journal Co. v. Commissioner,31 T.C. 902 (1959), affd. 274 F. 2d 284 (6th Cir. 1960). [27]
To *655 reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. In the petition filed herein, petitioner alleged that assessment and collection of the deficiencies determined by respondent for the taxable years ended May 31, 1972 and May 31, 1973, were barred by section 6501(a), I.R.C. 1954↩. Nevertheless, petitioner has failed to raise this issue at any other point in this proceeding. Accordingly, we find that petitioner has abandoned this issue, and therefore, we need not consider it.
2. Erickson Air-Crane Co. of Washington, Inc., became an IC subsidiary during the taxable year ended May 31, 1973.↩
3. The serial numbers of these helicopters were 64001, 64002, and 64003.↩
4. In some instances, the operating costs were divided between Sikorsky and the party performing the project.↩
5. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
6. The parties have stipulated that these items shall be considered as new sec. 38 property to the extent that we find that the four helicopters constitute new sec. 38 property.↩
7. The United States Forest Service is part of the Department of Agriculture and sells timber located on National Forest lands.↩
8. Not all of the timber within a tract was included in the contract with respect thereto. Each contract set forth a detailed definition of the term "included timber" that encompassed both timber "designated for cutting" and certain timber which was not so designated.↩
9. This agreement referred to June 15, 1973, as the "date of closing." ↩
10. Prior to June 15, 1973, Plumas had already logged some of the timber from the following tracts: Cold Stream; Bagley; Flournoy; and Lights Creek Skyline. 11. Throughout the opinion, we shall collectively refer to the nine above-mentioned USFS timber cutting contracts and the Cheney contract as "the timber contracts."↩
12. Plumas and LP have agreed that the volume of timber LP received pursuant to the sale agreement exceeded the warranted volume of 84,000,000 board feet. As of December 12, 1978, however, they had not resolved the calculation of the overrun.↩
13. Approximately 4,000,000 board feet of the warranted volume of timber was attributable to the estimated volume of logs receivable under the Cheney contract.↩
14. Plumas had no basis in these contracts.↩
15. Section 48(b) provides: (b) New Section 38 Property.--For purposes of this subpart, the term "new section 38 property" means section 38 property-- (1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or (2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date. In applying section 46(c)(1)(A) in the case of property described in paragraph (1), there shall be taken into account only that portion of the basis which is properly attributable to construction, reconstruction, or erection after December 31, 1961. Section 167(c) provides: (c) Limitations on Use of Certain Methods and Rates.-- Paragraphs (2), (3), and (4) of subsection (b) shall apply only in the case of property (other than intangible property) described in subsection (a) with a useful life of 3 years or more-- (1) the construction, reconstruction, or erection of which is completed after December 31, 1953, and then only to that portion of the basis which is properly attributable to such construction, reconstruction, or erection after December 31, 1953, or (2) acquired after December 31, 1953, if the original use of such property commences with the taxpayer and commences after such date.↩
16. See sec. 1.48-2(b)(7), Income Tax Regs. See also Rev. Rul. 68-111, 1968-1 C.B. 29; Rev. Rul. 80-313, 1980-2 C.B. 25↩.
17. The record shows that one of these helicopters was leased for a term of approximately one year. The helicopter which was so leased bore serial number 64060 and was subsequently sold to Air-Crane.↩
18. On brief, petitioners cited Rev. Rul. 78-433, 1978-2 C.B. 121↩, in support of their position. We have, however, carefully considered this ruling and found the facts therein to be readily distinguishable from those of the instant case.
19. Sec. 117(k)(2), I.R.C. 1939↩, as amended. 20. For a discussion of the background of the concept of economic interest see O'Connor v. Commissioner, 78 T.C.     (Jan. 4, 1982).When sec. 631(b) is inapplicable to a disposition subject to a retained economic interest because, for example, the timber has not been held for the requisite period, the receipts are taxable as ordinary income subject to cost depletion. Sec. 611. If sec. 631(b) applies, however, the taxpayer is not entitled to a depletion deduction for the timber. Sec. 1.611-1(b)(2), Income Tax Regs.↩
21. The term "capital investment" as used in this regulation "does not require an investment of cash or property by the taxpayer but can consist of an economic interest acquired by gift, inheritance, personal effort, governmental permits, or other circumstances." Bittker, Federal Taxation of Income, Estates and Gifts, par. 24.1.2 (Vol. 1 1981). See, e.g., Commissioner v. Southwest Exploration Co.,350 U.S. 308↩ (1956).
22. The warranted volume of timber included an estimated 4,000,000 board feet of timber which would be received under the Cheney contract. Consequently, the parties must have estimated that there was approximately 80,000,000 board feet of timber subject to the USFS timber cutting contracts. At the time of the sale, Plumas and LP had contemplated a sale of the timber contracts for a purchase price of $ 17.52 per thousand board feet of timber subject to those contracts.
23. Under the USFS timber cutting contracts, the purchaser was not responsible for losses, other than those due to its own negligence, attributable to the destruction of timber by causes such as fire or disease prior to the removal of the timber from the sale area.
24. See also J.R. Simplot Company v. Commissioner,T.C. Memo. 1967-104↩. 25. Although Plumas is considered the "owner" of the timber subject to the USFS timber cutting contracts for purposes of sec. 631(b), that fact has no bearing on the question of whether those contracts passed any present interest in standing timber. See Norton v. United States,213 Ct. Cl. 215, 551 F. 2d 821 (1977); J.R. Simplot Company v. Commissioner,T.C. Memo. 1967-104↩.
26. Section 1221 provides, in part: For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property * * * (4) accounts or notes receivable * * * (5) an obligation of the United States or any of its possessions * * *.↩
27. See also J.R. Simplot Company v. Commissioner,T.C. Memo. 1967-104↩.